UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 30, 2014

------------------------------X
JAGARNATH SAHU, et al.,              :
                                     :
              Plaintiffs,            :
                                     :         No. 07 Civ. 2156 (JFK)
      -against-                      :         **OPINION & ORDER**
                                     :
UNION CARBIDE CORPORATION            :
and MADHYA PRADESH STATE,            :
                                     :
              Defendants.            :
------------------------------X

Appearances

For Plaintiffs

      EARTHRIGHTS INTERNATIONAL
      By:  Richard Herz
           Marco Simons

      LAW OFFICES OF CURTIS V. TRINKO, LLP
      By:  Curtis V. Trinko

      LAW OFFICES OF H. RAJAN SHARMA, ESQ.
      By:  H. Rajan Sharma

For Defendant Union Carbide Corporation

      KELLEY, DRYE & WARREN, LLP
      By:  William A. Krohley
           William C. Heck


**JOHN F. KEENAN, United States District Judge:**

      Three motions are presently before the Court.  First,

Defendant Union Carbide Corp. ("UCC") has moved for summary

judgment on all of Plaintiffs' claims against it.  Second,

Plaintiffs move under Rule 56(d) for a "continuation" of UCC's

summary judgment motion to allow them to take the deposition of

Lucas John Couvaras, a former employee of UCC and of its former

affiliate, Union Carbide India Limited ("UCIL").  Third,
Plaintiffs also move under Rules 26(d) and 30(a) to take an
early deposition of Couvaras.

For the reasons that follow, UCC's motion for summary
judgment is granted.  Plaintiffs' Rule 56(d) motion is denied,
as is their motion made under Rules 26(d) and 30(a).

### I.   Background

### A.   Procedural History

This action, which will be referred to as <u>Sahu II</u>, and its
predecessors arise out of the leak of hazardous chemicals
originating from a chemical manufacturing facility in Bhopal,
India (the "Bhopal Plant") that was operated from 1969 to 1984
by UCIL, of which Defendant UCC was then a majority owner.
Prior to the filing of this case, Plaintiffs were absent class
members of a putative class in another action before this Court,
<u>Bano v. Union Carbide Corp.</u>, No. 99 Civ. 11329 (S.D.N.Y.).  I
ultimately dismissed that action, in part because the statute of
limitations had expired.  <u>See</u> <u>id.</u>, 2003 WL 1344884 (S.D.N.Y. Mar.
18, 2003), <u>aff'd in part</u>, 361 F.3d 696 (2d Cir. 2004).

Some of the Plaintiffs in the instant case were also
plaintiffs in a similar action, <u>Sahu v. Union Carbide Corp.</u>, No.
04 Civ. 8825 ("<u>Sahu I</u>"), which asserted personal injury claims
and sought damages and injunctive relief.  In that action, I

granted summary judgment for UCC on June 26, 2012. See id., 2012 WL 2422757 (S.D.N.Y. June 26, 2012).  I concluded, based on the voluminous evidence in the record, that there was no genuine dispute of material fact that would allow a reasonable juror to find UCC either directly or indirectly liable for any of the injuries alleged.  The Second Circuit affirmed that decision in full.  See 528 F. App'x 96 (2d Cir. 2013).  In its June 27, 2013 summary order, the panel stated:  "Sahu and many others living near the Bhopal plant may well have suffered terrible and lasting injuries from a wholly preventable disaster for which someone is responsible.  After nine years of contentious litigation and discovery, however, all that the evidence in this case demonstrates is that UCC is not that entity." Id. at 104.

In 2007, Plaintiffs filed the instant case to toll the running of the statute of limitations on their property damage claims while Sahu I was before the Second Circuit on an earlier appeal.  Immediately after filing this action, Plaintiffs moved for a stay pending the resolution of the Sahu I appeal.  As Plaintiffs then observed,

> The facts at issue in [Sahu I] parallel those at issue in this action.  In both cases, plaintiffs allege that Defendants caused massive contamination of the soils and drinking water supply of many residential communities in the vicinity of the former UCIL plant with toxic and carcinogenic chemicals emanating and spreading through a common groundwater aquifer from the land and premises of the former UCIL

> plant.   Whether the District Court was correct to
> grant summary judgment to Defendants on the issue of
> their potential liability, which is now on appeal,
> will bear upon the litigation of the instant action.
> . . . [T]he Second Circuit's decision will soon
> provide this Court with invaluable guidance and
> clarification of this issue.

(ECF. No. 3 at 3-4.)  I granted Plaintiffs' motion and stayed

this action on April 3, 2007.  It remained stayed while the

parties litigated Sahu I upon its remand by the Second Circuit

for further discovery.

On June 26, 2012, after again entering summary judgment in

favor of Defendants in Sahu I, I directed the parties to address

the effect of that ruling on the instant action, Sahu II.

Counsel for the Sahu II Plaintiffs urged that the stay should

continue pending their appeal of my Sahu I decision, again

because "the forthcoming decision of the Second Circuit in [Sahu

I] will likely provide guidance to the Court and the parties" in

Sahu II. (July 31, 2012 Gambhir Ltr. at 3.)  I agreed with

Plaintiffs that a Second Circuit ruling in Sahu I would aid the

consideration of this matter, and left the stay in place. (ECF

No. 21.)

The Second Circuit affirmed my entry of summary judgment in

Sahu I on June 27, 2013.  See 528 F. App'x 96.  It denied the

Sahu I plaintiffs' petition for rehearing on July 25, 2013, and

the mandate issued on August 1, 2013.  Thereafter, UCC informed

the Court that it intended to move for summary judgment in Sahu II "for the same reasons, and on the same record, as in Sahu I because the factual allegations, legal theories and relevant evidence are the same in both cases." (Aug. 26, 2013 Heck Ltr. at 1.)  Plaintiffs then advised the Court that they wished to amend their complaint prior to the litigation of UCC's contemplated motion.  I granted leave to both sides and set a briefing schedule.  Plaintiffs later sought and obtained additional leave to make the motion under Rules 26(d) and 30(a) for an early deposition of Couvaras.

### B.   Plaintiffs' Amended Complaint and Summary Judgment Facts

Plaintiffs filed their amended complaint on November 6, 2013, asserting claims for damage to their property.  At the outset, the Court observes that the amended complaint removes Warren Anderson, UCC's former Chief Executive Officer, who was a defendant in the original complaint.  The amended complaint adds the state of Madhya Pradesh, which owns the site of the former Bhopal Plant.  The only relief Plaintiffs seek against the state is an injunction directing it to cooperate in any court-ordered clean-up of the site.  The state has not appeared in this action.

The following facts are undisputed.  UCIL was incorporated in India in 1934.  In 1969, the Bhopal Plant began operations as

a pesticide formulations plant on land leased from the state of Madhya Pradesh.  As a formulations plant, UCIL imported the chemical components of pesticide products and mixed the final product, such as the "Sevin" pesticide, in India.  During this period, UCC owned 60 percent of UCIL.

In the 1970s, the Government of India implemented new restrictions designed to strengthen domestic production and control of industry.  For example, India required "that local manufacture replace imports as soon as feasible." (Heck Aff. Ex. H at A-105.)  Consequently, the Bhopal Plant was back-integrated into a facility capable of manufacturing pesticides.  Moreover, the Government of India mandated that "all possible work in engineering and construction will be done in India." (Id. at A-97.)  Because Indian legislation also required "a dilution of foreign held equity whenever new capital expenditures are made," UCC's ownership interest in UCIL was reduced to 50.9 percent. (Pl. Oppo. Br. at 3-4; Heck Aff. Ex. H. at A-1606.)

The Bhopal Plant operated as a manufacturing facility for several years.  In the normal course of operations, the plant generated wastes.  Generally, solid wastes were disposed of in onsite tanks and pits, while wastewater was treated and then pumped to three solar evaporation ponds lined with black polyethylene sheets.  Plaintiffs allege that chemicals seeped

6

into a ground aquifer, polluting the soil and drinking water in residential communities near the Bhopal Plant site.  In 1984, after a catastrophic gas leak, the Indian Government closed the Bhopal Plant.  In 1994, UCC sold its stake in UCIL; UCIL's name was later changed to Eveready Industries India Limited ("EEIL"). In 1998, EIIL terminated its lease of the Bhopal Plant site and surrendered the property to the government of Madhya Pradesh.

Plaintiffs bring negligence, public and private nuisance, strict liability, and trespass claims against UCC.  They seek compensatory and punitive damages, as well as injunctive relief to remedy the complained-of property damage.

### C.    The Instant Motions

Relying in large part upon the record developed in Bano and Sahu I, UCC moves for summary judgment as to all theories of liability.  Plaintiffs counter that there is evidence in this case, not present in Sahu I, establishing genuine issues of material fact.  This evidence includes a declaration by Couvaras, which Plaintiffs have submitted not only in opposition to UCC's summary judgment motion, but also in support of their two motions seeking leave to take Couvaras's deposition.

## II.  Relevant Legal Standards

### A.  The Scope of this Court's Review

In view of the complex procedural history of this action and its predecessors, it is appropriate to clarify how the Court has approached the resolution of these motions.  This action involves many, but not all, of the same parties and attorneys as Sahu I.  It is well settled that collateral estoppel generally may not apply against a plaintiff who did not appear in the earlier action. See, e.g., Hansberry v. Lee, 311 U.S. 21, 40 (1940) ("It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."); see also Taylor v. Sturgell, 553 U.S. 880, 891–95 (2008) (discussing the limited exceptions to this principle). Although Plaintiffs' counsel acknowledged at oral argument that collateral estoppel might apply to those Plaintiffs who were parties in Sahu I, I believe the simpler and more prudent course is to evaluate the claims of all Plaintiffs on the merits.

As will be discussed, the evidentiary record contains several new documents, but is otherwise composed of the same materials as were analyzed by this Court and the Second Circuit in Sahu I.  At oral argument, Plaintiffs' counsel conceded that

8

I may rely on my previous readings of individual documents that were in the Sahu I record, and acknowledged the general persuasive value of Sahu I. (Oral Arg. Tr. at 12.)  However, with respect to the evidentiary record as a whole — i.e., the Sahu I record combined with new documents submitted to "fill the gaps" in the Sahu I plaintiffs' proof — and whether that record shows that UCC is entitled to summary judgment, I emphasize that I am starting fresh.

### B.   Summary Judgment Standard

A moving party is entitled to summary judgment when the evidence, viewed in the light most favorable to the non-movant, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Vacold LLC v. Cerami, 545 F.3d 114, 121 (2d Cir. 2010).  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets that burden, the opposing party must then come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary

case." <u>Scott v. Coughlin</u>, 344 F.3d 282, 287 (2d Cir. 2003).

"The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 743 (2d Cir. 2003) (alterations omitted).  If it is clear that no rational jury "could find in favor of the nonmoving party because the evidence to support its case is so slight," summary judgment should be granted. <u>F.D.I.C. v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (quoting <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

The Second Circuit has cautioned that "an expert's report is not a talisman against summary judgment." <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997) (citing <u>Viterbo v. Dow Chem. Co.</u>, 826 F.2d 420, 422 (5th Cir. 1987) (summary judgment not impossible "whenever a party has produced an expert to support its position")).  Generally, a court should not make credibility determinations about an expert when deciding a summary judgment motion, because "credibility issues are normally resolved by a jury based on the in-court testimony." <u>City of N.Y. v. Golden Feather Smoke Shop, Inc.</u>, No. 08 Civ. 3966, 2013 WL 3187049, at *18 (E.D.N.Y. June 20, 2013) (citing <u>Jeffreys v. City of New</u>

10

York, 426 F.3d 549, 551 (2d Cir. 2005)); see also Scanner Techs.
Corp. v. Icos Vision Sys. Corp., 253 F. Supp. 2d 624, 634
(S.D.N.Y. 2003).  But if, after construing the expert reports in
the non-movant's favor, the court concludes that an admissible
report is "insufficient to permit a rational juror to find in
favor of the plaintiff, the court remains free to . . . grant
summary judgment for defendant." Amorgianos v. Nat'l R.R.
Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

        Finally, Rule 56(d) (formerly Rule 56(f)) allows a court to
grant additional time for discovery if the non-movant cannot
present facts justifying its opposition to summary judgment.
However, "a plaintiff cannot defeat a motion for summary
judgment by merely restating the conclusory allegations
contained in his complaint, and amplifying them only with
speculation about what discovery might uncover." Contemporary
Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 (2d Cir.
1981).  Accordingly, the court may properly deny Rule 56(d)
relief "if it deems the request to be based on speculation as to
what potentially could be discovered." Paddington Partners v.
Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).

### C.  Early Discovery Standard

        Plaintiffs also move to take Couvaras's deposition under
Rule 26(d) and Rule 30.  Rule 26(d)(1) states that discovery

should not occur before Rule 26(d) conference unless authorized by the Federal Rules of Civil Procedure, by stipulation, or by court order.  "Although the rule does not say so, it is implicit that some showing of good cause should be made to justify such an order, and courts presented with requests for immediate discovery have frequently treated the question whether to authorize early discovery as governed by a good cause standard." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2046.1 (3d ed. 2010); see also Pearson Educ., Inc. v. Doe, No. 12 Civ. 4786, 2012 WL 4832816, at *3–4 (S.D.N.Y. Oct. 1, 2012) (collecting cases).  Rule 30 likewise states that a party must obtain leave of court to take an early deposition. See Fed. R. Civ. P. 30(a)(2)(A).  As always, the court "plainly has discretion to reject a request for discovery if the evidence sought would be cumulative or if the request is based only on speculation as to what potentially could be discovered." In re Dana Corp., 574 F.3d 129, 148–49 (2d Cir. 2009) (citation and internal quotation marks omitted).

### D.   Substantive New York Law

It is undisputed that New York law applies to the instant action.  Both Plaintiffs and UCC cite New York law in their briefs. (Pl. Oppo. Br. at 14–16; Def. Reply Br. at 6–8.)  That is consistent with the approach taken both by this Court and by

the Second Circuit in <u>Sahu I</u>. <u>See</u> 528 F. App'x at 101 & n.3;

2012 WL 2422757, at *4.  Accordingly, this Court applies New

York law to Plaintiffs' claims, which sound in negligence,

nuisance, strict liability, and trespass.

### 1.   Negligence

It is black letter law that a prima facie claim for

negligence requires a plaintiff to establish the elements of

duty, breach, causation, and damages. <u>E.g.</u>, <u>Aegis Ins. Servs.,</u>

<u>Inc. v. 7 World Trade Co., L.P.</u>, 737 F.3d 166, 177 (2d Cir.

2013); <u>Sawyer v. Wight</u>, 196 F. Supp. 2d 220, 226 (E.D.N.Y. 2002)

(citing <u>Denman v. Coppola Gen. Contracting Corp.</u>, 683 N.Y.S.2d

617, 618 (3d Dep't 1998)).  As the Fourth Department has

explained,

> Causation incorporates at least two separate but
> related concepts:  cause-in-fact and proximate cause.
> Cause-in-fact refers to those antecedent events, acts
> or omissions which have "so far contributed to the
> result that without them it would not have occurred."
> Ordinarily, this requirement is satisfied if the given
> act or omission was a substantial factor in producing
> the resultant injury.  It is not sufficient to find a
> defendant negligent, unless it is further shown that
> such negligence was the proximate cause of the
> injuries suffered by a plaintiff.  "[P]roximate cause
> is a question separate and apart from that of duty and
> negligence and it is only when these initial issues
> are resolved against the tort-feasor that the question
> of proximate cause arises."  Proximate cause serves to
> limit, for legal or policy reasons, the responsibility
> of an actor for the consequences of his conduct.

<u>Monahan v. Weichert</u>, 442 N.Y.S.2d 295, 298 (4th Dep't 1981).

## 2.  Nuisance

A public nuisance "is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency." Copart Indus., Inc. v. Consolidated Edison Co. of New York, Inc., 362 N.E.2d 968, 971 (N.Y. 1977).  "It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to . . . endanger or injure the property, health, safety or comfort of a considerable number of persons." Id. (internal citations omitted).  In resolving the instant motions, the Court assumes without deciding that Plaintiffs have standing to pursue a public nuisance claim. Accord Sahu I, 528 F. App'x at 102 n.4.

Private nuisance requires defendant's "invasion of another's interest in the use and enjoyment of land" that is "(1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." Copart Indus., 362 N.E.2d at 971.  Such invasion is considered intentional "when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct." Id. at 972–73.  On the other hand, "whenever a [private] nuisance has its origin in negligence, negligence

14

must be proven." Id. at 972.  Whether public or private, "[o]ne
who creates a nuisance through an inherently dangerous activity
or use of an unreasonably dangerous product is absolutely liable
for resulting damages, [regardless] of fault." State v.
Schenectady Chemicals, Inc., 459 N.Y.S.2d 971, 976 (N.Y. Sup.
Ct. 1983), aff'd as modified, 479 N.Y.S.2d 1010 (3d Dep't 1984).
"While ordinarily nuisance is an action pursued against the
owner of land for some wrongful activity conducted thereon,
everyone who creates a nuisance or participates in the creation
or maintenance of a nuisance are liable jointly and severally
for the wrong and injury done thereby." Id. (internal quotation
omitted).

### 3.  Trespass

Trespass is the intentional invasion of another person's
property. Scribner v. Summers, 84 F.3d 554, 557 (2d Cir. 1996);
accord Volunteer Fire Ass'n of Tappan, Inc. v. Cnty. of
Rockland, 956 N.Y.S.2d 102, 105 (2d Dep't 2012).  The New York
Court of Appeals has explained that

> while the trespasser, to be liable, need not intend or
> expect the damaging consequence of his intrusion, he
> must intend the act which amounts to or produces the
> unlawful invasion, and the intrusion must at least be
> the immediate or inevitable consequence of what he
> willfully does, or which he does so negligently as to
> amount to willfulness.  To constitute such a trespass,
> the act done must be such as 'will to a substantial
> certainty result in the entry of the foreign matter'.

The application of the above-stated rule, in the few pertinent New York cases, to damage claims arising from the underground movements of noxious fluids, produces this conclusion:  that, even when the polluting material has been deliberately put onto, or into, defendant's land, he is not liable for his neighbor's damage therefrom, unless he (defendant) had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land.

Phillips v. Sun Oil Co., 307 N.Y. 328, 331 (1954) (citations omitted); accord Scribner, 84 F.3d at 557.

**4.   Whether In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation Mandates a Different Analysis**

As set forth above, the standards governing Plaintiffs' causes of action are well settled; all require Plaintiffs to show that UCC caused the complained-of injury. See, e.g., Aegis Ins. Servs., 737 F.3d at 178-79 (negligence); Bigio v. Coca-Cola Co., 675 F.3d 163, 173 (2d Cir. 2012) (trespass); Scribner, 84 F.3d at 559 (private nuisance); Shore Realty Corp., 759 F.2d at 1044 n.17 (strict liability); People ex rel. Spitzer v. Sturm, Ruger & Co., Inc., 761 N.Y.S.2d 192, 197-99 (1st Dep't 2003) (public nuisance).  As the Second Circuit noted, then, the dispositive question is "whether UCC played a sufficiently direct role in causing the hazardous wastes to seep into the ground to be held liable." Sahu I, 528 F. App'x at 101-02 (citing Spitzer, 761 N.Y.S.2d at 198 n.2).

16

Plaintiffs argue that a recently decided Second Circuit case compels a new, more generous legal standard that is different than the one used by this Court and the Second Circuit in Sahu I.  They refer to In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 725 F.3d 65 (2d Cir. 2013), cert. denied, 134 S. Ct. 1877 (2014).  That case concerned Exxon's liability for its MTBE-treated gasoline contaminating a system of water wells in Queens.  The jury first found that Exxon was liable as a "direct spiller" for gasoline leaks emanating out of storage tanks at Exxon-owned gas stations.  Second, the jury also found that Exxon was liable as a "manufacturer, refiner, supplier, or seller" of the MTBE-treated gasoline that leaked or spilled from gas stations not owned by Exxon.  Plaintiffs conclude that because the Second Circuit affirmed liability, it thereby approved a "different, less stringent standard than that in Sahu I." (Pl. Oppo. Br. at 16.)

Plaintiffs are incorrect.  First, In re MTBE did not announce a new standard of law.  Indeed, as Plaintiffs acknowledge, the test applied in that case is the "traditional 'substantial factor' test" for causation of an injury. (Pl. Oppo. Br. at 16.)  The Second Circuit panel wrote:

> Under New York law, an act or omission is regarded as a legal cause of an injury "if it was a

17

> substantial factor in bringing about the injury."
> Schneider v. Diallo, 788 N.Y.S.2d 366, 367 (1st Dep't
> 2005). The word "substantial" means that the act or
> omission "had such an effect in producing the injury
> that reasonable people would regard it as a cause of
> the injury." Rojas v. City of New York, 617 N.Y.S.2d
> 302, 305 (1st Dep't 1994) (internal quotation marks
> omitted).

In re MTBE, 725 F.3d at 116. The New York cases cited in this

section are not new; they are from 2005 and 1994, preceding the

Sahu I panel's decision by several years. To be sure,

Plaintiffs can eventually try to convince the Second Circuit

that the Sahu I panel overlooked or misread those decisions.

But they cannot persuasively argue before this Court that In re

MTBE renders Sahu I a dead letter.

Second, as a substantive matter, Sahu I can be squared with

the legal test in In re MTBE. Both the Second Circuit and I

concluded that "no reasonable juror could find that UCC

participated in the creation of" the alleged nuisance. 528

F. App'x at 102; accord 2012 WL 2422757 at *16 ("Plaintiffs have

not adduced evidence that both UCC and UCIL participated in the

creation of a nuisance."). Absent such participation, UCC

simply cannot have been a "substantial factor" in creating the

injury alleged by the Sahu I plaintiffs.

Finally, In re MTBE is distinguishable on its facts. As

the panel in that case noted, "Exxon incurred tort liability not

for the mere use of MTBE, but because it engaged in additional

tortious conduct." In re MTBE, 725 F.3d at 101 n.22.  There, the
jury heard testimony that "Exxon knew station owners would store
this gasoline [containing MTBE] in underground tanks that
leaked, and introduced evidence that Exxon knew specifically
that tanks in the New York City area leaked." Id. at 121.  The
jury concluded that "Exxon knew that the gasoline containing
MTBE . . . would be spilled," and that Exxon was "substantially
certain" that its gasoline would leak into groundwater. Id. at
120.  This and other knowledge tortious conduct sufficed to
demonstrate Exxon's participation in a nuisance and trespass.
By contrast, both the Sahu I panel and I concluded that nothing
in the Sahu I record indicated any tortious conduct by UCC. See
528 F. App'x at 102; 2012 WL 2422757, at *12–13, *16.  That lack
of evidence distinguishes Sahu I.

Thus, as stated earlier, the central question remains
"whether UCC played a sufficiently direct role in causing the
hazardous wastes to seep into the ground to be held liable."
Sahu I, 528 F. App'x at 101–02.  This question is answered below
as to each of Plaintiffs' theories of liability.

### III. Analysis

The Court first addresses Plaintiffs' contention that
Couvaras was a UCC employee during the relevant periods, as well
as their motions for leave to take Couvaras's deposition.  The

Court then turns to the resolution of UCC's summary judgment motion.

### A.   Plaintiffs' "New" Evidence Regarding Couvaras Does Not Create a Genuine Dispute of Material Fact

Plaintiffs assert that Couvaras, the Project Manager overseeing the Bhopal Plant's construction, was actually a UCC employee during the relevant periods, not a UCIL employee as previously believed.  From this proposition, Plaintiffs contend that "jury may find that UCC [through Couvaras] had final authority over even detail design, including of the waste disposal system." (Pl. Oppo. Br. at 2; see id. at 5, 8, 20.) The argument is that everything Couvaras did can now be imputed to UCC, which provides a basis for holding UCC liable.

To support their assertion that Couvaras was a UCC employee, Plaintiffs cite to two new declarations.  First, Couvaras's own declaration states that he "was a UCC employee assigned to UCIL from 1971 to the end of 1981, to manage the engineering and construction of the plant based on proprietary UCC design." (Couvaras Dec. ¶ 1.)  Second, the declaration of Tota Ram Chauhan, who identifies himself as a UCIL employee from 1975 to 1985, states that Couvaras was a UCC employee "who was sent to India to oversee the detail design and erection of the plant." (Chauhan Dec. ¶ 2.)

20

The Court concludes that, late-breaking declarations notwithstanding, Plaintiffs have failed to create a genuine dispute of material fact as to Couvaras's status.  The documentary evidence from the relevant time period consistently and conclusively demonstrates that Couvaras acted as a UCIL employee when he served as Project Manager.  This evidence first includes the Definition of Services between UCC and UCIL, which states that UCC's Chemicals and Plastics Engineering Department would provide "a project manager on loan to UCIL for the project," in view of the fact that project management was specifically listed as UCIL's responsibility. (Heck Aff. Ex. S at A-3128-29).  Second, the summary judgment record also includes a 1985 affidavit of Ranjit Dutta, originally submitted in the earlier Union Carbide litigation before this Court.[1]

---

[1]     Plaintiffs dispute the admissibility of the Dutta affidavit because (1) UCC did not rely on the affidavit in its initial moving brief, and (2) Plaintiffs did not get to depose him. (Pl. Surreply at 5-7.)  They made a similar argument in Sahu I.  In that case, I decided not to consider the Dutta affidavit, even though "all the documents were previously produced to Plaintiffs in [Sahu I] or in Bano." Sahu I, 2012 WL 2422757, at *2.

Two years have passed since that ruling, and Plaintiffs' counsel have had notice and possession of the Dutta affidavit during that time.  Moreover, it was submitted as an exhibit to UCC's motion for summary judgment.  Finally, it is squarely relevant to Plaintiffs' argument that Couvaras was a UCC employee.  For these reasons, the 29-year-old affidavit is unquestionably fair game, and the Court will no longer decline to consider it.

Dutta was a former plant manager and General Manager of the
Agricultural Products Division of UCIL, and states in part:

> When Mr. Couvaras came to UCIL in 1972, he became
> a UCIL employee and he remained a UCIL employee for
> nine years, until 1981, when he went to the Middle
> East. He is consistently listed as a UCIL employee in
> UCIL's annual reports. (Indian law requires annual
> reports to list employees). As a UCIL employee, he
> reported to me, when I was plant manager and also when
> I was General Manager of UCIL's Agricultural Products
> Division. As a UCIL employee, he also reported to
> UCIL management and all of his activities on the
> project were supervised and directed by UICL's
> management.

(Heck Aff. Ex. N at A-1785.)  Third, as Dutta notes, Couvaras

was listed as a UCIL employee in UCIL's annual reports. (Heck

Reply Aff. Ex. 1, 2, 3.)  Fourth, other documents in the record

address Couvaras as a UCIL employee. See Heck Aff. Ex. H at A-

178; Heck Aff. Ex. R at A-2879, A-2923.  Fifth, the record

contains a 1985 affidavit by Warren J. Woomer, who was formerly

the Works Manager of the Bhopal Plant. See generally In re Union

Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984,

634 F. Supp. 842, 853 (S.D.N.Y. 1986), aff'd as modified, 809

F.2d 195 (2d Cir. 1987).  Woomer avers:  "Plaintiffs have also

attempted to portray L.J. Couvaras as a Union Carbide employee

who was responsible for every aspect of the design and

construction of the plant.  In fact, Mr. Couvaras was employed

by UCIL for nine years and reported within that organization in

Bombay, and was at the Bhopal plant only for limited periods."
(Heck Aff. Ex. O at A-1890.)

Couvaras's own declaration avers that he was "a UCC
employee assigned to UCIL from 1971 to the end of 1981, to
manage the engineering and construction of the plant." (Couvaras
Dec. ¶ 1.)  This statement is arguably susceptible to more than
one interpretation on the question of who was Couvaras's actual
employer during his tenure as Plant Manager.  Accordingly, the
Court construes it in the light most favorable to Plaintiffs,
and reads it to posit that Couvaras was a UCC employee during
that period.  But even if that is what Couvaras meant, the
contention is wholly unsubstantiated.  Rather, the documentary
evidence shows that Couvaras became a UCIL employee when he took
on the role of Project Manager.

Nor does the Chauhan declaration offer any compelling
insight, because it provides no basis for Chauhan's conclusory
statement that Couvaras was a UCC employee during the relevant
periods. See Fed. R. Civ. P. 56(c)(4) (declaration "must be made
on personal knowledge").  UCC asserts that the Chauhan
declaration must be disregarded altogether because Chauhan
asserts no personal knowledge on that question.  The Court
declines to reach the question of the Chauhan declaration's
admissibility, because even if the declaration is admissible, it

23

presents no bar to the entry of summary judgment in view of the evidence.

Finally, Plaintiffs have not shown that deposing Couvaras is necessary under Rule 56(d), nor that good cause exists to do so pursuant to Rules 26(d) and 30.  Plaintiffs have already procured a sworn declaration from Couvaras; the Court is unable to discern what might be gained by going back to the well. Plaintiffs urge that Couvaras is "uniquely qualified" to opine on the relationship between UCC and UCIL. (Pl. Rule 56(d) Moving Br. at 3-4.)  But the evidentiary record in this case is literally thousands of pages long, and the documents contained therein are contemporaneous with the conduct alleged in the amended complaint, whereas Couvaras would be testifying based upon decades-old recollection if deposed.  Because deposing Couvaras would be cumulative of the summary judgment record in this case, and because Plaintiffs' justifications for such a deposition do not rise above the speculative, Plaintiffs' motions are denied.[2]

---

[2]    In light of this ruling on the merits of Plaintiffs' Rule 56(d) request, it is not necessary to consider UCC's argument that the motion is "procedurally improper" because Rule 56(d) "does not contemplate a separate motion." (UCC Rule 56(d) Oppo. Br. at 1.)  The Court nevertheless observes that UCC cites no authority for its position, which appears to be against the weight of practice in this Circuit. See, e.g., XAC, LLC v. Deep, 517 F. App'x 25, 27 (2d Cir. 2013) (summary order) (reviewing district court's denial, on the

### B.   No Reasonable Juror Could Find for Plaintiffs on Any of Their Theories

As discussed, the dispositive question is whether UCC caused the damages alleged by Plaintiffs — as phrased by Plaintiffs, whether "UCC's acts were a substantial factor in causing the pollution." (Pl. Oppo. Br. at 1.)  Plaintiffs contend that a rational jury could find UCC liable on the evidentiary record before the Court, and offer five principal arguments in support of their position.  The first argument, that the Second Circuit has adopted a new, lower standard for tort claims under New York law, was rejected above. See supra Part II.D.4, slip op. at 16–19.  The remaining four are discussed in turn.

### 1.   Plaintiffs' Contention that UCC Is Liable for Providing the MIC Process

UCIL's 1973 Capital Budget Proposal envisioned that the Bhopal Plant would include facilities to manufacture methyl isocyanate ("MIC"), among other chemicals. (Heck Aff. Ex. H. at

---

merits, of a Rule 56(d) motion); Nat'l Union Fire Ins. Co. of Pittsburg, PA. v. Stroh Cos., 265 F.3d 97, 117 (2d Cir. 2001) (same under the former Rule 56(f)); accord, e.g., Hicks v. Johnson, --- F.3d ----, 2014 WL 2793806, at *2–3 (1st Cir. 2014); Lunderstadt v. Colafella, 885 F.2d 66, 71 (3d Cir. 1989). But see Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 299 (2d Cir. 2003) (mentioning, without comment, that the lower court had declined to entertain a motion made under the former Rule 56(f), and had directed the movant to seek such relief "in his formal opposition to the pending motions, in a manner compliant with the Rule's requirements").

A-112.)  The Capital Budget Proposal anticipated UCC providing
UCIL with technology for MIC production. (Id.)  The status of
UCC's MIC process was listed as "commercial," meaning that it
was already in use at plants then in operation. (Id.)

Plaintiffs contend that by-product of the MIC process
constituted the primary source of the pollutants emanating from
the Bhopal Plant.  Their amended complaint alleges that the
plant's MIC unit generated "hydrochloric acid wastes that posed
the plant's major disposal problem and necessitated the acid
neutralization pits and solar evaporation ponds," and that the
groundwater was eventually contaminated by toxins found under
those ponds. (Amended Compl. ¶ 58.)  Plaintiffs argue that a
jury could therefore find UCC liable for their damages because
UCC's MIC process design was a substantial factor in creating
pollution. (Pl. Oppo. Br. at 18.)

This argument is distinct from Plaintiffs' contentions,
discussed below, that UCC tortuously designed a faulty system
for disposing of the MIC unit's waste.  Rather, here they argue
that liability flows from the MIC production process itself.  To
support this claim, Plaintiffs and their experts purport to
dissolve the distinction between the general design of the MIC
process, which UCC contributed, and the detail design,
implementation, and construction performed by UCIL and its

26

contractors.   Thus, Plaintiffs urge that UCC's MIC process design is actually "part of" the waste management system. (Pl. Oppo. Br. at 18.)  One of their experts, Dr. Jurgen H. Exner, adds that "[d]etailed design follows and implements process design." (Exner ¶ 5.)   Tying it all together, another expert, Dr. Ivan von Lindern, asserts that "process engineering and design are never far removed, and are generally not separable, from pollution control." (von Lindern Dec. ¶ 14.)  This blurring of lines, according to Plaintiffs, constitutes new evidence that precludes the entry of summary judgment. (Pl. Oppo. Br. at 18.)

On the contrary, this line of reasoning seems calibrated to gloss over the "traditional notions of remoteness, proximate cause, and duty" that were fatal to the Sahu I plaintiffs' claims. Sahu I, 528 F. App'x at 101.  Because Plaintiffs have no evidence of actual tortious conduct by UCC, they seek instead to lump together all of the steps that led to the construction of the MIC unit.  This mischaracterization cannot succeed, however, because the documents in evidence show that in fact, UCC and UCIL delineated their responsibilities very clearly.  UCIL had responsibility for the "overall venture" at Bhopal, and was charged with contracting for detailed design, with construction, and with operation of the plant. (Heck Aff. Ex. S at A–3128.) Even with respect to processes supplied by UCC, such as the MIC

27

process, the task of designing and providing facilities for the disposal of waste was reserved to UCIL. (Id. at A-3136.)  Dr. von Lindern attempts to distinguish waste disposal from "overall waste management strategy," and approvingly cites the Bhopal Plant General Operating Manual for the proposition that "the premier consideration in the overall waste management strategy is 'sharp' operations." (von Lindern ¶ 16.)  But even if the Court accepts this proposition, UCC is not liable because UCIL operated the Bhopal Plant, not UCC. (Heck Aff. Ex. S at A-3128.) UCIL was therefore responsible for managing the wastes the plant produced in the course of those operations.

This Court does not need an expert to explain the self-evident proposition that detail design necessarily follows general process design, and it is equally obvious that the process of manufacturing chemicals produces waste.  But it does not necessarily follow that the production of chemicals itself constitutes legal causation of a tort. Cf. Spitzer, 761 N.Y.S.2d at 202 ("While plaintiff aptly recognizes that it must prove defendants caused or contributed to the nuisance, we cannot also conclude that, no matter how far removed from defendants' lawful business practices the harm is felt, defendants nevertheless remain liable under a common-law public nuisance theory.").  The record in this case indicates that pollution was caused by the

28

disposal of waste at Bhopal.  As in <u>Sahu I</u>, Plaintiffs cannot

succeed in holding UCC liable for the overall manufacturing

operations of UCIL upon a mere showing that UCC provided the MIC

process technology. <u>See</u> 2012 WL 2422757, at *10.  And while

Plaintiffs insist that <u>In re MTBE</u> compels a different result,

that claim is rejected for the reasons discussed in Part II.D.4

above.

    Plaintiffs make three other points in furtherance of this

theory of liability, none of which are compelling.  First,

Plaintiffs and von Lindern repeatedly assert that UCC's

Institute plant, which also used the MIC process, had problems

with leaks and discharged more toxins than its permits allowed.

(Pl. Oppo. Br. at 18–19 (citing von Lindern Dec. ¶¶ 26–27, 60–

62, 64).)  But even if it is true (and admissible) that another

plant experienced waste disposal problems, and even if it is

true that those problems arose from MIC production at Institute

— which Plaintiffs do not even allege, much less demonstrate —

such waste disposal problems are distinct from, and thus utterly

irrelevant to, the question whether liability attaches to the

MIC process itself.[3]  Second, Plaintiffs direct the Court's

---

[3]    Nor are alleged waste disposal issues at Institute relevant to
the waste disposal issues at the Bhopal Plant, because as discussed
below, and as Plaintiffs concede, the methods for waste disposal at
Bhopal were very different from those at Institute. <u>See</u> <u>infra</u> Part

attention to a letter from UCIL to the Indian Department of Industrial Development dated September 30, 1982, seeking approval for continued collaboration on MIC-based pesticides with UCC. (Herz Dec. Ex. D.)  The import of this document is not clear, since UCC acknowledges that it provided the MIC process design. See, e.g., Heck Reply Aff. ¶ 20.  Although Plaintiffs apparently believe the letter shows "that UCC played an integral role in determining how UCC's design would be implemented" (Pl. Oppo. Br. at 19), the Court notes that the letter was written well after the design was implemented and the MIC unit was built.  Finally, Plaintiffs repeat their contention that Couvaras remained a UCC employee when he served as Project Manager, and that "UCC therefore approved" the Bhopal Plant's design. (Pl. Oppo. Br. at 20.)  Because the evidence demonstrates that Couvaras was a UCIL employee during this period, Plaintiffs' contention is rejected. See supra Part III.A, slip op. at 20-24.

## 2.   Plaintiffs' Contention that UCC Designed the Bhopal Plant's Waste Disposal System

Plaintiffs posit that UCC dictated the strategy for waste disposal at the Bhopal Plant, and that UCC's strategy was implemented.  They further argue that the designs furnished by

---

III.B.2; accord Pl. Oppo. Br. at 22-23 (noting that the waste disposal strategy at Bhopal "lacked key components of the Institute system").

UCC caused the pollution alleged in the amended complaint.  They also contend that any design work done in India was overseen by Couvaras, and therefore by UCC.

In support of these arguments, Plaintiffs' memorandum chiefly cites the reports of their experts, von Lindern and Exner.  For example, Plaintiffs' brief quotes the von Lindern declaration for the proposition that "UCC played the 'dominant role' in developing 'the waste management strategy and the design of the overall waste management system.'" (Pl. Oppo. Br. at 21 (quoting von Lindern Dec. ¶¶ 17, 20).)  UCC argues that these declarations are not admissible under Rule 702, because they merely offer legal conclusions instead of helping to understand the evidence. (Def. Reply Br. at 5.)  But as with the Chauhan declaration, the Court need not rule on admissibility. It is sufficient to conclude that the summary judgment record simply does not support Plaintiffs' theory, certainly not to the extent that creates a dispute of material fact.

The Court begins its analysis with the general statement from the Capital Budget Proposal that "all possible work in engineering and construction will be done in India with UCIL assuming an overall responsibility for implementation of the project." (Heck Aff. Ex. H at A-97.)  The July 12, 1973 Definition of Services elaborates:

31

> Pressure to hold U.S. engineering involvement to
> a minimum has come both from the current U.S. shortage
> of engineers and from the desire by UCIL to perform as
> much of the design as possible in India.  As a result
> . . . many portions of the design that would normally
> be performed at the [UCC] Technical Center as an
> extension of the process design will instead be
> transferred in whole or in part to India.

(Heck Aff. Ex. S at A-3127.)

With respect to waste disposal specifically, the memorandum
plainly states that "UCIL will have the primary responsibilities
for designing and providing the . . . facilities for . . .
disposal of wastes." (Id. at A-3136.)  Consistent with that
allocation of responsibility, the February 7, 1976 report
describing "proposed Waste Disposal Facilities for the
Pesticides Plant of Union Carbide India Limited at Bhopal,
India" was prepared by UCIL's Engineering Department,
Agricultural Products Division. (Heck Aff. Ex. R at A-2879.)
The report was approved by Couvaras — who, contrary to
Plaintiffs' theory, was a UCIL employee. See supra Part III.A.

Plaintiffs contend that UCC had a specific vision for the
solar evaporation ponds, and that UCIL merely carried out this
vision. (Pl. Oppo. Br. at 7.)  The documentary evidence proves
otherwise.  First, UCC's July 21, 1972 memorandum contains a
"preliminary" evaluation of waste disposal problems, one that
was "based on very preliminary and incomplete information."
(Heck Aff. Ex. H at A-156.)  Notwithstanding these disclaimers,

von Lindern somehow concludes that the evaluation constitutes the "final design basis for the waste disposal system." (von Lindern ¶ 42.)  But this evaluation was undertaken not to dictate a final or mandatory design of the Bhopal Plant's waste disposal facilities.  Rather, its purpose is plainly announced: to "(a) provide a basis for estimating investment and operating cost, (b) recommend further development, and (c) serve as a basis for negotiations with the Indian Government." (Heck Aff. Ex. H at A-156.)

More important, the ponds that were actually constructed at the Bhopal Plant were very different from UCC's early suggestions, confirming that they were designed by UCIL and its contractors.  First, the 1972 preliminary evaluation memorandum states that "[t]o avoid danger of polluting subsurface water supplies in the Bhopal area, this pond should be lined with clay suitable for rendering the pond bottom and dikes impervious to water." (Heck Aff. Ex. H at A-158.)  But in January 1977, UCIL's engineering consultants determined that building the pond as suggested by UCC would be too expensive. (Heck Aff. Ex. T at A-3508.)  Instead, UCIL and its consultants devised an "alternative scheme for the Pond so as to effect cost reduction," which used a polyurethane lining to "reduce use of

expensive murum and non-swelling clay," and which eliminated a catch drain.[4] (Id. at A-3508-09.)

Second, UCC's June 15, 1973 memorandum on UCIL's waste disposal plans notes that UCIL planned to build a 13-acre solar evaporation pond with a life expectancy of nine months. (Heck Aff. Ex. R at A-2715.) The author of the UCC memorandum, G.R. Hattiangadi, opined that "[s]izing a pond for a life expectancy of under a year . . . is not advisable," and suggested a 35-acre pond. (Id. at A-2716.) Nevertheless, UCIL's February 7, 1976 Waste Disposal System Description of Facilities conveys UCIL's plan to construct a 10-acre evaporation pond anticipated to "last about four months after Phase II goes into operation, then a second pond will have to be constructed." (Id. at A-2895.) Ultimately, one 4-acre evaporation pond with an estimated life of 4 years, one 18-acre evaporation pond, and a third back-up pond were built — totaling well below the 35 acres of pond area suggested by UCC. (Heck Aff. Ex. H at A-230.)

---

[4]    Plaintiffs attempt to tie UCC to these decisions by repeatedly citing the sixth paragraph of the Chauhan declaration, which posits: "UCC engineers approved the creation, sizing and choice of materials for the solar evaporation ponds . . . .  Any change in choice of materials or pond liners would have been approved by UCC engineering." (Chauhan ¶ 6.)  Chauhan does not cite any documents to support this supposition, and indeed it is unsupported by the evidence in the summary judgment record. See Great Am. Ins. Co., 607 F.3d at 292 ("conclusory allegations or unsubstantiated speculation" present no bar to summary judgment).

Plaintiffs cite a May 5, 1972 letter from UCC to Couvaras for the proposition that "UCC determined the method of waste disposal, including the ponds." (Pl. Oppo. Br. at 21 (citing Herz Dec. Ex. A).)  In fact, the letter merely memorializes a conversation wherein Byer, a UCC employee, "expressed to you our concern" regarding the disposal of byproduct hydrochloric acid. (Herz Dec. Ex. A.)  This concern is consistent with Byer's subsequent memorandum of May 16, 1972. (Heck Aff. Ex. Q at A-2695.)  Indeed, it led to UCC's suggestion that UCIL employ a clay lining for the evaporation pond "[t]o avoid danger of polluting subsurface water supplies" (id. at A-2513), and to Hattiangadi's June 15, 1973 memorandum, which made pond size suggestions that UCIL chose to disregard (Heck Aff. Ex. R at A-2714).  Critically, UCC informed UCIL that "[a]fter he transmits the comments he has prepared on the proposals that have been made in India, Mr. Hattiangadi has no further obligation to provide general information on the disposal of plant wastes – other than any reviews or consultations that may be specifically requested by personnel in India." (Id.)  Thus, UCC made clear that further responsibility for the design of the Bhopal Plant's waste disposal system belonged to UCIL.  This delineation was memorialized in the December 2, 1973 Capital Budget Proposal. See Heck Aff. Ex. H at A-97.

In sum, the record simply does not support Plaintiffs'
contention that UCC determined the method of waste disposal at
the Bhopal Plant.  To the extent that von Lindern contends
otherwise, he does so by ignoring or misreading the documentary
evidence.  Instead, the record indicates that (1) UCC offered a
preliminary evaluation and limited feedback to UCIL, which then
(2) worked with its local contractors to implement a disposal
system that disregarded many of UCC's concerns, leading to (3)
the pollution that allegedly caused Plaintiffs' property damage.
In light of this sequence of events, Plaintiffs' argument that
"the very idea" to use evaporation ponds caused pollution is
baseless. (Oral Arg. Tr. at 18–19; see also Pl. Oppo Br. at 15
n.12.)  On this record, no reasonable juror could premise
liability on the limited contributions of UCC.

### 3.   Plaintiffs' Contention that UCC Had "Oversight Authority over Waste Handling"

As part of their opposition, Plaintiffs present excerpts
from UCC's corporate policy manual on environmental affairs.
(Herz Dec. ¶ 3.)  The exhibit includes Policy 2.30, with the
subject "Health, Safety and Environmental Laws and Regulations —
Compliance and Enforcement." (Id. Ex. B at 1–9.)  It also
includes Policy 2.32, with the subject "Environmental Affairs"
(id. at 10–15), as well as a memorandum entitled "Management of
Health, Safety, and Environmental Affairs in International

Affiliates (id. at 16–17).  To these excerpts, UCC adds a
section of the manual entitled "International Affiliates —
Corporate Policy and Procedures Application." (Heck Reply Aff.
Ex. 5.)

Plaintiffs argue that this statement of corporate policy
evidences UCC's "oversight authority over waste handling," as
well as control of its affiliates' compliance with environmental
laws. (Pl. Oppo. Br. at 23–24.)  Accordingly, Plaintiffs posit,
"a jury may find UCC was a substantial factor in waste handling
failures at UCIL." (Id. at 24.)  These mischaracterizations
notwithstanding, no reasonable jury could find UCC liable based
on the contents of this manual.

To begin with, the manual explains that while it proposes
"objectives, commitments, and systems of management" that are
"intended to apply, wherever feasible, worldwide," UCC
recognizes that these policies might be "modified or expanded"
by its affiliates as appropriate. (Heck Reply Aff. Ex. 5 at 2.)
Moreover, the manual plainly affirms that "[i]nternational
affiliates are separate legal entities." (Id.)  As such, "[t]he
UCC-affiliate relationship should preserve the authority and
accountability of the Board of Directors of the affiliate for
the management of the affiliate, and recognize the legitimate
rights and interests of host governments and non-UCC

shareholders." (Id.)  This section also clarifies that "policies and procedures which are labeled as applicable to the international are primarily directed to the UCC manager who has a line role to represent UCC's interests on the boards of directors of international affiliates." (Id.)  Given the manual's explanation of its intended audience, and its clear distinction between UCC and the affiliates, no reasonable juror could conclude that UCC "controlled" UCIL's handling of waste as Plaintiffs urge.

To be sure, the document professes UCC's worldwide commitment to compliance with environmental and health laws. But under the heading "Delegation," Policy 230 explicitly states that international affiliates such as UCIL are assigned and delegated the responsibility for

> [d]evlopment and administration of a management system, including policies, procedures, objectives, and audits, for compliance with, and responses to enforcement actions relating to, governmental health, safety, and environmental laws and regulations, patterned after the UCC system but modified or expanded, as necessary, to accommodate the scope and kind of activities carried out in the area company or affiliate, and adapted, as necessary, to conform to the legal, political and social constraints on the affiliate.

(Herz Dec. Ex. B at 3.)  In similar language, Policy 232 also states in no uncertain terms that it is the affiliate's responsibility to develop context-specific policies and

38

procedures to ensure environmental compliance. (<u>Id.</u> at 12.)
Policy 232 also expressly reserves to affiliates such as UCIL
the "line duty and end-result accountability for protection of
the environment at locations in which the affiliates operate."
(<u>Id.</u>)

In sum, while Plaintiffs suggest that the manual
demonstrates UCC's control over UCIL, down to the handling of
waste, review of the document reveals that suggestion to be
baseless.  Plaintiffs' argument is rejected.

### 4.  Plaintiffs' Contention that UCC Is Liable with Respect to Rehabilitation of the Site

The amended complaint alleges that the remediation of the
Bhopal Plant site was "insufficient and grossly negligent,"
which exacerbated the damage to Plaintiffs' property. (Amended
Compl. ¶ 2; <u>see</u> <u>id.</u> ¶¶ 86–112.)  Plaintiffs argue that "UCC was
a substantial factor" in this remediation, such that it can be
held liable for the damage.  UCC's alleged involvement includes
providing input on a plan for acid sludge disposal, devising and
implementing a plan for soil-washing, developing rehabilitation
strategies and standards, holding meetings, and participating in
the creation of the landfill in the third evaporation pond. (Pl.
Oppo. Br. at 24.)

First, Plaintiffs claim that "UCIL's request of UCC for an
'on-site joint review . . . to finalize [an acid sludge

disposal] action plan,' suggests UCIL required UCC's input, if
not approval." (Pl. Oppo. Br. at 24 (citing Heck Aff. Ex. H at
A-263).)   The problem with this theory is that there is no
evidence such a review ever actually occurred.   Indeed, UCC had
advised UCIL the prior year that it had "no additional advice to
offer for removal of the sludge" aside from forwarding UCIL
recommendations it had obtained from other entities. (Heck Aff.
Ex. H at A-258-59.)

Second, Plaintiffs assert that "UCC's soil-washing plan for
the ponds was implemented." (Pl. Oppo. Br. at 24.)   However,
neither the amended complaint nor Plaintiffs' brief attributes
any pollution or other damage to soil-washing.   Indeed, the
evidentiary record indicates that the pumping and soil-washing
had no environmentally destructive effects. (Heck Aff. Ex. U at
A-3570.)

Third, Plaintiffs claim that UCC "developed clean-up
standards and a rehabilitation strategy" for the Bhopal site.
(Pl. Oppo. Br. at 24; see also id. at 12 (citing Heck Aff. Ex. I
at A-498-501).)   But in fact, the UCC memorandum cited by
Plaintiffs confirms that UCIL would appoint the National
Environmental Engineering Research Institute ("NEERI") in tandem
with consultant Arthur D. Little "to initiate their assessment
of both the major site and ponds and develop . . . a remediation

40

strategy for both locations." (Heck Aff. Ex. I at A-499.)  NEERI
had previously been retained by the Government of Madhya Pradesh
to investigate the environmental damage caused by waste disposal
in the evaporation ponds and to propose decontamination
procedures. (Heck Aff. Ex. K at A-992.)  After UCIL developed a
remediation program for the ponds with NEERI and Arthur D.
Little, the memorandum states that "UCIL, using contractors and
in accord with NEERI/ADL direction [would] implement
remediation." (Id. at A-500.)  Other internal documents confirm
that "responsibility for the investigation of and any future
rehabilitation of the Bhopal site rests with the affiliate,
UCIL." (Heck Aff. Ex. I at A-373.)

Fourth, Plaintiffs point to the fact that meetings about
remediation were held at UCC.  The evidentiary record indicates
that on several occasions, employees of each company attended or
planned to attend meetings concerning the progress of the Bhopal
site rehabilitation. See, e.g., Heck Aff. Ex. H at A-270 (report
from a June 1989 meeting in South Charleston); Heck Aff. Ex. I
at A-384 (proposing an August 1990 meeting in Danbury).  Another
document suggests that UCC made its scientists available to UCIL
employees to familiarize them with the procedures and
instruments used in clean-up work generally. (Heck Aff. Ex. I at
A-398-400.)  But Plaintiffs point to nothing in the record about

41

these meetings which would support a finding that UCC was a "substantial factor" in causing a tort.

Fifth and finally, Plaintiffs attempt to attach liability to UCC in connection with the conversion of the third evaporation pond into a landfill. (Pl. Oppo. Br. at 24.)  The amended complaint alleges that this landfill "has been, and continues to be, one of the primary sources of contamination spreading through the underground aquifer in and around the UCIL premises." (Amended Compl. ¶ 106.)  But Plaintiffs concede that the idea for converting the pond into a landfill was proposed not by UCC but rather by NEERI. (Pl. Oppo. Br. at 12–13 (citing Heck Aff. Ex. U at A-3647–49); accord Amended Compl. ¶ 105.) This was consistent with NEERI's earlier recommendation that the third pond "be converted into a secure landfill to contain the sediments and contaminated soil leaving 11 hectares of SEP area for reuse." (Heck Aff. Ex. K at A-992.)

Nor do Plaintiffs substantiate their conclusory allegation that "UCC participated in the landfill's creation." (Pl. Oppo. Br. at 24.)  After NEERI again recommended the landfill strategy in 1992, the Madhya Pradesh Pollution Control Board issued an order directing the conversion of the third pond into a landfill. (Heck Aff. Ex. I at A-573).  Thus, the decision to bury toxic waste in the former evaporation pond was proposed by

NEERI and mandated by the Government of India.  On this record, no reasonable juror could hold UCC liable for the problems that arose out of the landfill.

### 5.   UCC's Approval of the Bhopal Plant's Back-Integration

Although Plaintiffs allege that UCC approved the back-integration of the UCIL plant, see Pl. Oppo. Br. at 3, they apparently do not contend that such acquiescence was itself a cause of their damages, see generally id. at 15-24. Nevertheless, in an abundance of caution, the Court notes that such a contention would fail.

As mentioned earlier, the Bhopal Plant originally formulated pesticides but did not manufacture them.  After the Indian government began "requir[ing] that local manufacture replace imports as soon as feasible" (Heck Aff. Ex. H at A-105), UCIL proposed back-integrating the Bhopal Plant to manufacture pesticides.  Plaintiffs' amended complaint recognizes that the back-integration plan originated with UCIL. See Amended Compl. ¶ 48; accord Heck Aff. Ex. O at A-1888-89 (UCIL's 1973 back-integration proposal).

UCC's Management Committee "endorsed" UCIL's proposal on December 10, 1973. (Heck Aff. Ex. H at A-171-72.)  Given the transformative nature of the plan, and the fact that it proposed to reduce UCC's equity stake in UCIL, such review is not

43

surprising.  It is also not tortious conduct.  Furthermore,
nothing in the 1973 Capital Budget Proposal, the minutes of the
UCC Management Committee meeting in which UCC endorsed the
Capital Budget Proposal, or the 1977 Review of the Capital
Budget Proposal suggests that UCC participated in any polluting
activity.  Rather, as has been discussed, these documents
indicate that the manufacturing processes and waste disposal
systems to be implemented at the Bhopal Plant were all initially
proposed by UCIL. (Heck Aff. Ex. O at A-1916-18, A-1924-26.)

**C.   Judgment for Defendant Madhya Pradesh State Is Warranted**

As mentioned earlier, Plaintiffs' amended complaint added
the Indian state of Madhya Pradesh, which owns the site of the
former Bhopal Plant, as a defendant.  The only relief Plaintiffs
seek against Madhya Pradesh is an injunction directing them to
cooperate in clean-up of the site ordered by this Court against
UCC.  Because I conclude that there is no basis to hold UCC
liable for Plaintiffs' damage, there will be no court-ordered
cleanup in this action, and thus, no basis for enjoining Madhya
Pradesh.  It is therefore appropriate to enter judgment in favor
of the state on Count VII of the amended complaint.

## **IV.  Conclusion**

For the foregoing reasons, Defendant UCC's motion for

summary judgment is granted.  Judgment is entered for UCC on

Counts I through VI of the amended complaint.  Plaintiffs'

motions relating to the deposition of Couvaras are denied.

Judgment is also entered for Defendant Madhya Pradesh State on

Count VII of the amended complaint.  The Clerk of Court is

respectfully directed to close this case.


**SO ORDERED.**

Dated:    New York, New York
          July 30, 2014

_____
John F. Keenan
United States District Judge